NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ZOILO A. VENTURA | : | |
| | : | Civil Action No.  08-5792 (SRC) |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| MONTCLAIR STATE UNIVERSITY, | : | |
| et al, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**CHESLER, U.S.D.J.**

This matter comes before the Court on the motion for summary judgment filed by

Defendants Montclair State University ("MSU"), John Vitiello, Joseph Marzullo, Walter

Watkins, Dr. Timothy Carey, Walter Eddy, Theresa Geordino, Keesha Chavis, Joseph

Fornarotto, Evrin Aya, and Robert Caputo (collectively "Defendants") [docket item no. 30].

Plaintiff has opposed this motion [docket item no. 37].  The Court requested, and the parties

provided, supplemental briefing relating to whether MSU should be treated as an arm of the state

for Eleventh Amendment immunity purposes.  After consideration of the parties' briefing, the

Court has determined that it will grant in part and deny in part Defendants' motion for summary

judgment.  In the following discussion, the Court gives its reasons for the decision.

I.      **FACTUAL BACKGROUND**

The case arises from an employment dispute.  Plaintiff, Zoilo Ventura is a 58 year old

Hispanic male who has worked as a Senior Repairer at MSU.  Mr. Ventura sought, and was

denied, several promotions during his time at MSU.  Plaintiff alleges that such denials were

based on age and race/national origin discrimination.  Plaintiff also alleges that after filing

complaints both internally and to the Equal Employment Opportunity Commission ("EEOC") he

faced retaliation from his co-workers.


II.   DISCUSSION

A.  Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*,

223 F.3d 202, 204 (3d Cir. 2000).  In deciding a motion for summary judgment, a court must

construe all facts and inferences in the light most favorable to the non-moving party.  *See Boyle*

*v. Cnty. Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998).  The moving party bears the burden of

establishing that no genuine issue of material fact remains.  *See Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986).

Once the moving party has properly supported its showing of no triable issue of fact and

of an entitlement to judgment as a matter of law, the non-moving party "must do more than

simply show that there is some metaphysical doubt as to material facts."  *Matsushita*, 475 U.S. at

586; *see also Anderson*, 477 U.S. at 247-48.  Pursuant to Federal Rule of Civil Procedure 56(e),

the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather "must exceed the 'mere scintilla' threshold"), *cert. denied*, 507 U.S. 912 (1993)).

### B.   Eleventh Amendment Immunity

Defendants claim that Plaintiff's NJLAD, 42 U.S.C. § 1983, breach of contract, and intentional infliction of emotional distress claims against MSU are barred by the Eleventh Amendment.  "Whether a public university is entitled to Eleventh Amendment immunity is a fact-intensive review that calls for individualized determinations." *Bowers v. NCAA*, 475 F.3d 524, 546 (3d Cir. 2007).

This particular issue turns on the question of whether MSU is a state entity, immune from suit in federal court.  The Third Circuit applies the following test to this issue:

> We have adopted a three-part test to apply in order to determine whether an entity is an arm of the state for Eleventh Amendment purposes. That test examines the following three elements: (1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has.

*Id.* at 546.  These are referred to as the *Fitchik* factors. *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir. 1989).  The Court decides questions of Eleventh Amendment immunity as a matter of law. *Skehan v. State System of Higher Education*, 815 F.2d 244, 246 (3d Cir. 1987).

"[T]he party asserting Eleventh Amendment immunity bears the burden of proving entitlement to it." *Christy v. Pennsylvania Turnpike Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995).  MSU has not persuaded this Court that it is entitled to the immunity that attaches to state

entities.

As to the first *Fitchik* factor, the question is whether the State of New Jersey is obligated to pay a judgment against MSU.  Significantly, MSU does not claim that the State is obligated to pay a judgment against MSU.  Rather, MSU contends that it does not have sufficient funds to pay any judgment and such funds would come from the State whether directly or though MSU's State appropriation.  (Def's. Supp. Br. at 2-3.)  This assertion misses the point.  The Supreme Court has stated that the question at issue is "whether a money judgment against a state instrumentality or official would be enforceable against the State."  *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 430 (1997).  Even if it is true that the funds for any judgment would, one way or the other, end up coming from the State of New Jersey, that does not mean that a money judgment against MSU would be enforceable against the State of New Jersey.

The Third Circuit has consistently rejected arguments similar to that made by MSU:

The University argues that it will be required to pay indirectly any judgment against it because the State of Iowa will be required to increase appropriations to the University to compensate for the judgment.  The appropriate question to ask, however, is whether the State is obligated to pay or reimburse the University for its debts.  As we recently explained in *Febres* in rejecting a similar indirect liability argument, if a State is not under a legal obligation to satisfy a judgment, then any increase in expenditures in the face of an adverse judgment is considered a voluntary or discretionary subsidy not entitled to Eleventh Amendment protections.

*Bowers*, 475 F.3d at 547 (citation omitted).  MSU has failed to show that the State of New Jersey bears an obligation to pay a judgment against it.  Accordingly, the first factor does not weigh in favor of finding that MSU is entitled to Eleventh Amendment immunity.

As to the second *Fitchik* factor, the Third Circuit has stated:

The second *Fitchik* factor requires that we focus on whether the State itself considers the entity an arm of the state. Under the second factor, we look to how state law treats the entity generally; whether the entity can sue or be sued in its own right, whether the entity is separately incorporated, and whether the entity is immune from state taxation.

*Id.* at 548.  As to these points, MSU argues: 1) MSU has been established and named pursuant to state statutory authority; 2) MSU is a state agency allocated to the Department of State, pursuant to N.J.S.A. § 18A:3B-27; 3) the State has not given MSU the authority to sue and be sued; 4) MSU is not separately incorporated under state law; and 5) MSU is "exempt from real property taxes and sales to the same extent as any other agency of the State of New Jersey" as well as being exempt from federal income tax.

As to MSU's citation of N.J.S.A. § 18A:3B-27, that section, read in its entirety, works more against a finding of Eleventh Amendment immunity than for it:

> For the purposes of complying with the provisions of Article V, Section IV, Paragraph 1 of the New Jersey Constitution, any State institution of higher education which was allocated to the Department of Higher Education or other department of State government shall be allocated to the Department of State upon the effective date of this act. Notwithstanding this allocation, any such institution shall be independent of any supervision or control of the Department of State or any board, commission or officer thereof and the allocation shall not in any way affect the principles of institutional autonomy established in this act.

Thus, the statute makes clear that MSU is not a typical state agency, like the Department of Agriculture, for example.  The statute expressly states that, notwithstanding the allocation of these institutions to the Department of State, the institution is not under the supervision or control of the State.  Whether viewed in connection with the second *Fitchik* factor or the third, this weighs against finding that MSU is entitled to Eleventh Amendment immunity.

While MSU contends that it is not separately incorporated under state law, this is inconsistent with N.J.S.A. § 18A:64-6(a), which gives the board of trustees of a state college "the power and duty to: . . . Adopt and use a corporate seal."  The power to adopt and use a corporate seal necessarily implies independent corporate status – otherwise, it makes no sense.

Viewing these factors as a whole, it appears that MSU does have a special status as an entity affiliated with the State of New Jersey.  It is true that MSU was created by the State of

New Jersey, that it is recognized as a state university in N.J.S.A. § 18A:64-45, that no statutory

provision expressly gives it the authority to sue and be sued in its own name, and that it is

immune from state taxation.  Nonetheless, this must be viewed against the background of state

legislation during the past 25 years.

In 1986, the New Jersey legislature enacted the State College Autonomy Laws, which

established a transfer of governance from the State to the boards of trustees of the state colleges.[1]

In 1994, the state legislature enacted the Higher Education Restructuring Act of 1994, which

eliminated the state Department and Board of Higher Education, increasing the authority of state

college governing boards.  *Id.*  Thus, the Trustees' Reference Guide published by the New Jersey

Association of State Colleges and Universities states that the result of the past 25 years of

legislation is that state "colleges have been transformed into colleges and universities with a high

degree of self-governance."  *Id.* at 1.  This legislative history strongly suggests that the State of

New Jersey views MSU as an affiliated but autonomous entity, and not as an arm of the State.

Considering the elements comprising the second factor as a whole, while the State

appears to recognize MSU as having a special status as a state-affiliated entity, the State does not

appear to consider MSU an arm of the State.

The decision as to the third factor, the degree of autonomy of the entity, follows

straightforwardly from the discussion of the second factor.  MSU contends that it has minimal

autonomy.  (Def.'s Supp. Br. at 4.)  On this record, this Court does not agree.  Rather, MSU

appears to enjoy a high degree of autonomy.  The statute which states the powers of the boards of

trustees of state colleges, N.J.S.A. § 18A:64-6, gives such boards broad powers to manage and

---

[1] New Jersey State College/University Trustees' Reference Guide at 5 (6th ed. 2006), http://www.njascu.org/2006%20Reference%20Guide%20Web%20version.pdf ("Trustees' Reference Guide").

govern their institutions, including the power of eminent domain, as well as fully autonomous control over moneys appropriated to the college by the legislature. The fact that trustees are appointed by the Governor, and may be removed for cause by the Governor, does not negate the considerable degree of autonomy provided by the relevant authorizing statutes – not surprising, given that the legislation was known as the "State College Autonomy Laws."

This inference is further supported by this preamble language to the Higher Education Restructuring Act of 1994:

The Legislature finds and declares that:

a. the institutions of higher education are one of the most valuable and underutilized resources in the State; and

b. the elimination of unnecessary State oversight and its accompanying bureaucracy will serve to unleash the creativity and innovation of these institutions . . .

e. in order to provide institutions with the ability to fulfill their mission and Statewide goals, greater decision making and accountability must be placed at the institutional level . . .

1994 N.J. Laws 48 at 2. Certainly, the intent of the legislature is crystal clear – the elimination of unnecessary State oversight. It is difficult to square this with MSU's claim that its autonomy is minimal. It appears that the New Jersey legislature has put considerable effort into increasing the autonomy of the state colleges over the past 25 years. The third factor, the degree of autonomy of MSU, weighs against a finding of Eleventh Amendment immunity.

Weighing the three *Fitchik* factors together, this Court finds little to support a finding that MSU is entitled to Eleventh Amendment immunity. Rather, the three factors weigh in favor of finding that the State of New Jersey does not consider MSU to be an arm of the state. Therefore, because the only argument Defendants advance in support of dismissing Counts Two and Three is Eleventh Amendment immunity, Defendants' motion for summary judgment will be denied

with regard to those Counts.

### C.  First Count: Violations of Title VII

A plaintiff bringing an employment discrimination claim under Title VII must comply with the procedural requirements set forth in 42 U.S.C. § 2000e-5.  Before filing a lawsuit, a plaintiff must exhaust his administrative remedies by filing a timely discrimination charge with the EEOC.  *Id.* §§ 2000e-5 (b), (e)(1), (f)(1).  This charge must be filed within 300 days of the alleged unlawful employment practice   *Balis v.  Realtyline*, 2009 WL 799277, *3 (D.N.J. Mar. 25, 2009).  After the EEO issues a right-to-sue letter, the plaintiff may initiate a private action that is limited to claims within the scope of the initial EEOC charge.  *Barzanty v. Verizon Pa., Inc.*, 361 F. App'x 411, 413-14 (3d Cir. 2010).

Defendants move for summary judgment on Plaintiff's employment discrimination claims.  All disparate treatment[2] claims for employment discrimination under federal law are analyzed by application of the *McDonnell Douglas* test:

> The Court in *McDonnell Douglas* set forth a burden-shifting scheme for discriminatory-treatment cases.  Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action.  If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual.  The Courts of Appeals have consistently utilized this burden-shifting approach when reviewing motions for summary judgment in disparate-treatment cases.

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2003) (citations omitted).

If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to "articulate some legitimate, non-discriminatory reason" for the employer's action.

---

[2]A disparate treatment case is one in which the employer treats some people less favorably than others because of their membership in a protected class.  *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

*McDonnell Douglas*, 411 U.S. 792, 802 (1973).  The employer may satisfy the burden by introducing evidence which, taken as true, would allow the factfinder to conclude that there was a nondiscriminatory reason for the unfavorable employment decision.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).  The employer need not prove that the tendered reason actually motivated the decision.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The burden of proving intent remains with the Plaintiff.  *Id.*

If the defendant employer satisfies the burden, then "the plaintiff generally must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely then not a motivating or determinative cause of the adverse employment action."  *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994).

The case law makes clear that, as to demonstrating pretext, "this standard places a difficult burden on the plaintiff."  *Id.* at 765.

> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000) (quotation omitted).  Moreover:

> [T]he factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff.  The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct."  In other words, "it is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."

*Id.* at 146-147 (quoting *St. Mary's*, 509 U.S. at 519, 524).

Finally, this Circuit has found that individual employees are not subject to liability under

Title VII. *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996). Therefore, to the extent that Ventura has tried to assert Title VII claims against individual employees, this Court grants Defendants' motion for summary judgment.

### 1. Failure to promote

The EEOC charge dated January 29, 2008 (Pl.'s Ex. G [docket item no. 40 at 8-12]) was filed more than 300 days after the alleged unlawful conduct of 2005.  Plaintiff argues that these claims are not time-barred because they fall within the continuing violations doctrine.  This argument is unavailing.  The failure to promote was a discrete instance of alleged discrimination and cannot be resuscitated by the continuing violations doctrine.  *See e.g., Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 483-84 (3d Cir. 1997).  Accordingly, Defendants' motion for summary judgment will be granted as to the alleged discriminatory conduct of 2005.

Viewing the facts in the light most favorable to Plaintiff, the Court finds that he could establish a prima facie case for discriminatory non-promotion in July 2007.  A prima facie case requires proof that (1) plaintiff is a member of a protected class, (2) plaintiff is qualified for the job at issue, (3) plaintiff applied for and was rejected for the position, and (4) non-members of the protected class were treated more favorably.  *Blue v. Def. Logistics Agency*, 181 F. App'x 272, 273 (3d Cir. 2006).  There is no dispute that Ventura is a member of a protected class, but Defendants argue that Plaintiff was not qualified for the promotion.

Defendants claim that Ventura was not eligible for the July 2007 carpenter position because he was serving a four-month working test period.  (Defs.' Br. at 16-18.)  Documents submitted by both sides do not paint a clear portrait of the events critical to deciding this issue.  It appears that Ventura was hired as a Facilities Coordinator in November of 2005.  (Supplemental McGarvey Cert. Ex. B., Ex. A.)  It also appears that in order to attain permanent status in this

new position, Mr. Ventura needed to be certified by the State of New Jersey and only then undergo a four-month working test period.  (Supplemental McGarvey Cert. Ex. B., Ex. C.) During this testing period, Mr. Ventura would not be eligible for a promotion.  N.J.A.C. § 4A:4-5.1.  The critical issue is when Mr. Ventura was appropriately subject to the testing period.  A working test period must begin after State certification.  N.J.A.C. § 4A:4-5.2.  Mr. Ventura has presented evidence that his testing period was from January 2006 to May 2006.  (Pl.'s Ex. D.)  If this were the case, then he would have been eligible for the July 2007 promotion.

Defendants, however, suggest that Mr. Ventura was only certified by the State on June 18, 2007.  (Supplemental McGarvey Cert. Ex. B. ¶ 7, Ex. E.)  Indeed, if that were the case, then he very well may have been properly subject to the testing period when he applied for the July 2007 position.  However, the Court finds this underlying documentation to be insufficient.  The spreadsheet identified by Defendants is difficult to read at best and incomplete at worst.  It is unclear whether the entry identified by Defendants is in fact Ventura's earliest certification, or whether this is just a single page of the spreadsheet.

In addition to claiming that Mr. Ventura was not qualified for the July 2007 promotion, Defendants also argue that they ultimately selected a candidate that scored higher on the promotional exam.  (Defs.' Br. at 18; McGarvey Cert. Ex. O.)  If that were so, then that might indeed constitute a legitimate nondiscriminatory reason for the conduct.  However, as above, the Court finds the underlying documentation insufficient to reach this conclusion.  The cited exhibit does not on its face indicate the candidates scores, let alone indicate whether one scored substantially better than the other.

In light of these evidentiary deficiencies, there is a contested issue of material fact and the Court denies Defendants' motion for summary judgment as to the Title VII claim against MSU

regarding the 2007 non-promotion.  The Court is willing to entertain a renewed motion as to Mr. Ventura's non-promotion if better documentation is submitted.

### 2. Hostile work environment

Plaintiff asserts a hostile work environment claim against John Vitiello.  Defendants argue that this claim exceeds the scope of Mr. Ventura's EEOC complaint.  Plaintiff counters that this claim was presented in a letter mailed to the EEOC.  (Pl.'s Ex. F.)  The law is clear that when contemplating the scope of the subsequent law suit it is only the claims made in the formal charge that may be considered and not allegations made in ancillary paperwork.  *See e.g. Barzanty v. Verizon Pa., Inc.*, 361 F. App'x at 415 (determining that hostile work environment claim was outside the scope of the charge where related allegations were not made in the charge itself but rather in an intake questionnaire).  Not only does the formal charge serve to define the scope of the EEOC's investigation, but it also serves to provide the defendant with notice of the charges; other documents, even those on file with the EEOC, do not serve the notice function. *Id.*  The Court therefore will not consider Plaintiff's letter in determining whether the hostile work environment claim is within the scope of his EEOC charge.

The Court finds that Plaintiff's hostile work environment claim is not within the scope of his EEOC charge.  Ventura provided no facts that suggest a hostile work environment nor did he check the box indicating the charge was a "continuing action."  (Pl.'s Ex. G.)  Ventura did state that "[o]n at least two occasions [he had] been denied promotion. . . ."  *Id.*  Plaintiff's discriminatory non-promotion based claims are discrete and unrelated to the claim of a hostile work environment.  Therefore, Plaintiff's hostile work environment claim is outside the scope of the EEOC charge. *See e.g., Barzanty*, 361 F. App'x at 414 & n.4.  Defendants' motion for summary judgment is granted with regard to Plaintiff's Title VII hostile work environment claim.

### 3. Retaliation

Defendants argue, as above, that Ventura's retaliation claim exceeds the scope of his EEOC charge.  Because Plaintiff checked the box marked "RETALIATION" on his formal EEOC charge, the Court finds this argument without merit.  The Court denies Defendants' motion for summary judgment as to Plaintiff's Title VII retaliation claim.

### D. Fourth Count: Violations of New Jersey Law Against Discrimination

The New Jersey Law Against Discrimination ("NJLAD") makes it unlawful to subject people to differential treatment based on, for example, race, creed, color, national origin, nationality, ancestry, age, sex, familial status, marital status, or domestic partnership status.  In order to establish a prima facie claim under the NJLAD, Ventura must demonstrate that he "(1) belongs to a protected class; (2) applied for or held a position for which [he] was objectively qualified; (3) was not promoted to ... that position; and... (4) the employer... filled the position with a similarly-qualified person," *Middleman v. N.J. Transit*, 2010 WL 3932923, at *4 (N.J. App. Div. Sept. 28, 2010) quoting *Viscik v. Fowler Equip. Co.*, 173 N.J. 1, 14 (2002).  Once a prima facie claim has been established under the NJLAD the same burden shifting analysis formulated in *McDonnell Douglas* and outlined above in section II.C. applies.

The Court has already found that Plaintiff could make out a prima facie discrimination claim and that Defendants' supporting documents fail to rebut that claim.  Further, Defendants suggest that Mr. Ventura's NJLAD claim is barred by Eleventh Amendment immunity.  As discussed in section II.B., no such immunity applies to MSU.  Defendants also move for summary judgment on Plaintiff's claim for retaliation under the NJLAD, arguing that Plaintiff never suffered any adverse action.

The Third Circuit provides the following foundation for retaliation claims under the

NJLAD:

> To advance a prima facie case of retaliation under . . . the NJLAD, a plaintiff must
> show that: (1) the employee engaged in a protected employee activity; (2) the
> employer took an adverse employment action after or contemporaneous with the
> employee's protected activity; and (3) a causal link exists between the employee's
> protected activity and the employer's adverse action.

*Abramson v. William Paterson Coll.*, 260 F.3d 265, 286 (3d Cir. 2001).

Under Third Circuit law, "the 'adverse employment action' element of a retaliation

plaintiff's prima facie case incorporates the same requirement that the retaliatory conduct rise to

the level of a violation of 42 U.S.C. § 2000e-2(a)(1) or (2)."  *Robinson v. City of Pittsburgh*, 120

F.3d 1286, 1300-1301 (3d Cir. 1997).  Those statutory provisions state:

> (a) Employer practices. It shall be an unlawful employment practice for an
> employer--
>   (1) to fail or refuse to hire or to discharge any individual, or otherwise to
> discriminate against any individual with respect to his compensation, terms,
> conditions, or privileges of employment, because of such individual's race, color,
> religion, sex, or national origin; or
>   (2) to limit, segregate, or classify his employees or applicants for employment in
> any way which would deprive or tend to deprive any individual of employment
> opportunities or otherwise adversely affect his status as an employee, because of
> such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2.

A reasonable finder of fact could certainly find that Plaintiff's filing a grievance with

MSU Human Resources constituted a protected action.  (Ventura Dep. 91:17-92:5.)  Moreover,

this same finder of fact could conclude that being forced to use a shopping cart in lieu of a car to

transport tools across campus was an adverse employment action.  (Ventura Dep. 163:11-164:3.)

A reasonable jury might be persuaded by Plaintiff's testimony on this matter, and this is only one

among several material factual disputes that preclude entry of judgment as a matter of law.

Finally, individuals may only be held liable under the NJLAD pursuant to an aiding or

abetting theory.  *Tarr v. Ciasulli*, 181 N.J. 70, 84 (2004). To make such a finding, the employer

must first be found liable.  *Id.* at 82-83.  Defendants' argue in chief that the individually named

defendants cannot be held liable under the NJLAD because MSU, their employer, cannot be

found liable.  As demonstrated above, the Court has found otherwise.  Therefore, Defendants'

remaining claim is that Plaintiff has failed to allege evidence of aiding or abetting by the

individual named defendants.

The New Jersey Supreme Court considered aiding and abetting discrimination under the

NJLAD in *Tarr v. Ciasulli*, 181 N.J. 70, 84 (2004).  Discussing the Third Circuit's decision in

*Hurley v. Atlantic City Police Dep't*, 174 F.3d 95 (3d Cir. 1999), the Court held:

> Thus, in order to hold an employee liable as an aider or abettor, a plaintiff must
> show that (1) the party whom the defendant aids must perform a wrongful act that
> causes an injury; (2) the defendant must be generally aware of his role as part of
> an overall illegal or tortious activity at the time that he provides the assistance;
> and (3) the defendant must knowingly and substantially assist the principal
> violation.
>
> With respect to that determination, the comments to [Restatement (Second) of
> Torts] section 876 provide a list of five factors, relied on by the *Hurley* court, to
> assess whether a defendant provides 'substantial assistance' to the principal
> violator.  Those factors are: (1) the nature of the act encouraged, (2) the amount of
> assistance given by the supervisor, (3) whether the supervisor was present at the
> time of the asserted harassment, (4) the supervisor's relations to the others, and
> (5) the state of mind of the supervisor.

181 N.J. at 84.  *Tarr* makes clear that central to the establishment of aiding and abetting liability

in this type of case is the element of having provided substantial assistance to the principal

violator.  Mr. Ventura's deposition cites numerous incidents of discriminatory conduct directed

at him by the individual Defendants.  Based on the factors enumerated above, a reasonable jury

might find that these individuals aided and abetted MSU's principal violation.  Therefore, as to

Plaintiff's NJLAD claim against both MSU and the individual Defendants, the motion for

summary judgment will be denied.

### E. Fifth Count: Breach of an Employment Contract

Defendants argue that Plaintiff failed to comply with the notice provision of the New Jersey Contractual Liability Act ("CLA").  N.J. Stat. Ann. § 59:13-5.  Plaintiff does not dispute this.  Defendants' motion for summary judgment is granted with regard to Count Five of the Complaint.

### E. Sixth Count: Intentional Infliction of Emotional Distress

Defendants argue that Plaintiff failed to comply with the notice provision of the New Jersey Tort Claims Act.  N.J. Stat. Ann. § 59:8-3.  Plaintiff does not dispute this.  Therefore, Defendants' motion for summary judgment is granted with regard to Count Six of the Complaint.

### F. Punitive Damages

Finally, Defendants argue that punitive damages should not be awarded because Plaintiff has failed to demonstrate "intentional discrimination."  This is a fact intensive determination and therefore precludes entry of judgment as a matter of law.

### III.   CONCLUSION

For the foregoing reasons, this Court will grant in part and deny in part Defendants' motion for summary judgment.  An appropriate form of order will be filed together with this Opinion.


                           s/Stanley R. Chesler     
                           STANLEY R. CHESLER
                           United States District Judge

DATED: February 9, 2011